[Civ. No. 776.   Third Appellate District.—February 9, 1911.]

In the Matter of the Estate of JAMES DALY, Deceased.
MATILDA DALY, Contestant, Appellant, v. ELIZA-
BETH WEDEMEYER, Respondent.

NONSUIT—NATURE OF MOTION—QUESTION OF LAW—DEMURRER TO EVI-
DENCE.—A motion for a nonsuit, to prevent the submission of a
case to the jury, presents a question of law for determination by
the court.   The motion is equivalent to a demurrer to the evidence,
or an objection that, admitting all of the proved facts to be true,
they do not in legal effect operate in favor of the plaintiff or
entitle him to the relief asked for by him.

ID.—EFFECT OF EVIDENCE—PRIMA FACIE CASE—MOTION TO BE DENIED.—
The evidence on a motion for a nonsuit,. at the close of the plain-
tiff's case must be given its full probative force, whether it has
been erroneously admitted or not; and on such motion the evidence
must be taken most strongly against the defendant; and if the
plaintiff has introduced proof enough to make out a *prima facie*
case under his pleading, the motion for a nonsuit at the close of his
case should be denied.

ID.—PROCEEDING TO CONTEST WILL—RULES OF NONSUIT IN CIVIL CASES
APPLICABLE.—In determining whether or not, in a proceeding to
contest a will, the evidence produced by the contestant is sufficient
to require the submission of the case to the jury, the same rules
apply as in civil cases.   Every favorable inference fairly arising
from the evidence produced must be considered as proved in favor of
the contestant; and where the evidence is fairly susceptible of two
constructions, the court must take the view most favorable to the
contestant; and if there is any substantial evidence tending to sus-
tain the contest, the contestant is entitled to have the case go to the
jury upon its merits, and a nonsuit is improper.

ID.—CONTEST BY MOTHER OF WILL TO STRANGER AFTER PROBATE—UN-
DUE INFLUENCE—IMPROPER NONSUIT.—Where a will in favor of a
stranger was contested after probate by the mother of deceased,
for undue influence, and the evidence shows that he went to live
with such stranger, while ill and weak in body and mind, to be
cared for by her, and while on his way thither with a friend, he re-
quested him to prepare a will to give his poultry to her for her care,
and his farm to his mother, brothers and sisters in Ireland, and
when he came to see him the next day to talk further about the will
he found him unconscious, and previously said stranger had sent for
an attorney to prepare a will in her favor, and after the friend had
left for inability to talk with him the will so prepared was exe-
cuted, and the deceased died the next day, in view of such facts,
and other facts and circumstances in proof, the inference is fairly

deducible that deceased did not execute the will of his own volition, but by her influence over his debilitated mind; and a nonsuit of the contestant was improperly granted.

APPEAL from a judgment of the Superior Court of Sonoma County. Thomas C. Denny, Judge.

The facts are stated in the opinion of the court.

S. K. Dougherty, for Appellant.

F. A. Meyer, and Thomas J. Geary, for Respondent.

HART, J.—The contestant instituted proceedings for the revocation of the probate of the last will and testament of her son, James Daly, deceased, and, on the close of her case, the court, on the motion of the respondent, granted a judgment of nonsuit.

This appeal is from said judgment.

The will purports to give, bequeath and devise all the testator's estate "of every kind and character and wherever situated to my friend, Mrs. Elizabeth Wedemeyer, absolutely and forever." Said Elizabeth Wedemeyer is named by the testator as executrix of said will, to act as such "without being required to give any bonds whatever." The testament also authorizes the executrix "to sell, at either public or private sale, any or all of my estate without any order of court so to do and without any notice of sale."

The grounds upon which the revocation of the order admitting said will to probate is urged are: 1. That said will was not properly or duly executed—that is, that the execution of the instrument was unattended by certain essential formalities. 2. That the execution of said will was procured solely by and through undue influence exercised by the beneficiary thereunder upon the testator at the time of the execution of the testament.

As stated, upon the close of the contestant's case a motion by the respondent for a nonsuit was granted by the court, and the important question involved here is whether the court was justified in thus taking the case from the jury.

"A motion for a nonsuit presents a question of law for determination by the court. The motion is tantamount to a

demurrer to the evidence, or an objection that, admitting all the proved material facts to be true, said facts do not in legal effect operate in favor of plaintiff, or, in other words, do not entitle him to the relief asked for by him." (*Bush* v. *Wood*, 8 Cal. App. 650, [97 Pac. 710], and cases therein cited.)   And the evidence, on a motion for a nonsuit on the close of plaintiff's case, must be accorded the benefit of its full probative force, and this is true whether the evidence has been erroneously admitted or not.   It is also true that on such motion the evidence must be taken most strongly against the defendant (*Goldstone* v. *Merchants' Ice Co.*, 123 Cal. 625, [56 Pac. 776]), and if the plaintiff has introduced proof sufficient to make out a *prima facie* case under the allegations of his complaint, the motion, if made on the close of his case, should be denied.   (*Janin* v. *London etc. Bank*, 92 Cal. 14, [27 Am. St. Rep. 82, 27 Pac. 1100, 14 L. R. A. 320]; *Non-refillable Bottle Co.* v. *Robertson*, 8 Cal. App. 103, [96 Pac. 324]; *Archibald's Estate* v. *Matteson*, 5 Cal. App. 441, [90 Pac. 723]; *Bush* v. *Wood*, 8 Cal. App. 650, [97 Pac. 710].)

In short, as is said in *Bush* v. *Wood*, 8 Cal. App. 650, [97 Pac. 710], "it is clear that it makes no difference, where the motion for a nonsuit is made on the close of plaintiff's case, whether the court itself believes the testimony or not, for, as is obvious, the material facts which the evidence tends to prove must be assumed to be true for the purpose of the motion, just the same as the material facts alleged in a pleading must be so treated in the consideration of a demurrer to such pleading."

In the case of the *Estate of Arnold,* 147 Cal. 583, [84 Pac. 252], speaking of a motion for a nonsuit upon the close of contestant's case, in a will contest, the supreme court says: "In determining whether or not, in a proceeding to contest a will, the evidence produced by the contestants is sufficient to require the submission of the case to the jury, the same rules apply as in civil cases.   Every favorable inference fairly deducible, and every favorable presumption fairly arising, from the evidence produced must be considered as facts proved in favor of the contestants.   *Where evidence is fairly susceptible of two constructions, or if either of several inferences may reasonably be made, the court must take the view most favorable to the contestants.* (Italics ours.)   All the

evidence in favor of the contestants must be taken as true, and if *contradictory evidence has been given, it must be disregarded. If there is any substantial evidence tending to prove in favor of contestants all the facts necessary to make out their case, they are entitled to have the case go to the jury for a verdict on the merits.''* (See, also, *Estate of Welch,* 6 Cal. App. 45, [91 Pac. 336].)

Viewed by the light of the foregoing rules, by which trial courts must be controlled in deciding a motion for a nonsuit on the close of plaintiff's case, the order allowing the motion for a nonsuit in the case at bar cannot for a moment be upheld, as we think an examination of the evidence produced by the contestant will clearly and unquestionably prove.

Of the two grounds upon which the probate of the will is sought to be revoked, the principal and most important is the charge that the alleged execution of the will was procured through the exercise of undue influence upon the testator by the respondent at the time of the execution of the instrument, to which proposition the evidence is mainly addressed.

The evidence discloses these facts: The deceased, James Daly, was a native of Ireland, and at the time of his death, in the county of Sonoma, this state, on the twenty-fifth day of December, 1908, was of the age of about fifty-three years. He came to the United States when a young man and for several years resided at Minneapolis, in the state of Minnesota. Residing in Ireland when first he came to the United States were his father, mother, sisters and brothers. After having been in the United States for about six years he returned to his old home in Ireland for the purpose of visiting with his mother, his father having died a short time previously. He remained in Ireland for three years and then returned to the United States, finally locating on what is known as the Cotati Rancho, in Sonoma county, California. Here he purchased two small tracts of land and engaged in the business of raising chickens and selling eggs to the markets. According to his own opinion, as expressed to several of his neighbors (witnesses at the contest), he was suffering from catarrh of the stomach, but whatever might have been his precise physical malady, he for more than a year prior to his death continued to grow so weak in body and mind as the result of his illness that it became plainly apparent

to his near neighbors, who saw him every day or two, that he was unable to take care of himself, and that, consequently, it was absolutely necessary that he should be given attention and care by some person or persons who would be willing to thus minister to his necessities. A Mr. Tompkins, a neighbor, as well as other neighbors, frequently urged him to procure the services of someone to look after him in his illness, and he was often heard to say that he would like to have a sister living in Ireland to come to his home for that purpose.

On the twenty-second day of December, 1908, however, said Mr. Tompkins called at the home of deceased and found him in almost a helpless condition. On that occasion Tompkins said to Daly that he (Daly) must be taken to some place where he could receive proper medical and other treatment, and deceased replied that he had made up his mind to go to the home of Mrs. Wedemeyer, a neighbor (the respondent here), where he would remain until he recovered. Tompkins thereupon promised Daly that he would return the following day and take him (Daly) to Mrs. Wedemeyer's. On the last-mentioned day—the twenty-third day of December—Tompkins went to the home of Daly, and, placing him in a wagon, drove to Mrs. Wedemeyer's. On arrival there, the respondent said she was perfectly willing to take care of Daly, and Tompkins helped the deceased into the house. At this time Daly had grown so weak, physically, that he was scarcely able to stand on his feet. In fact, Mrs. Wedemeyer herself testified that, on being lifted from the wagon to the ground by Tompkins, Daly sank to the ground, not being able to stand on his feet.

On the way to the home of Mrs. Wedemeyer, however, Tompkins spoke to Daly about his property affairs. The deceased said to Tompkins that he desired that the stock and poultry on his place should be given to Mrs. Wedemeyer as compensation for taking care of him in his illness, and that all other property left by him, in case of his death, he desired should be given to his "folks" in Ireland. Tompkins suggested that he ought to make a will, and Daly thereupon requested him to write one for him, proceeding at the same time to give the names and postoffice addresses in Ireland of his mother, sisters and brothers to whom it was his wish that his estate should go. As the deceased was thus naming his

relatives, Tompkins suggested that the matter of executing a will had better be postponed until they reached the home of Mrs. Wedemeyer, as he (Tompkins) could not remember all the names and addresses as Daly was then giving them.

On reaching Mrs. Wedemeyer's home, Daly was placed on a lounge in the kitchen of that lady's house, and shortly thereafter Tompkins departed for home, intending to return on the next day and prepare a will for Daly in accordance with his wishes as to the testamentary disposition of his estate, as expressed by Daly on the way to Mrs. Wedemeyer's.

On the afternoon of Wednesday, the twenty-third day of December (the same day, it will be borne in mind, on which Daly was brought to her house), Mrs. Wedemeyer went to Petaluma and interviewed Mr. Frank A. Meyer, an attorney at law and one of the counsel for respondent in this proceeding. She requested said attorney to call at her home the next day for the purpose of giving Daly legal advice with regard to the execution of a last will and testament. She testified that she called on Mr. Meyer for the purpose mentioned at the request of Daly himself.

Early on the succeeding day—December 24th—Tompkins returned to Mrs. Wedemeyer's. The purpose of this visit was, as before suggested, to prepare a will for Daly. Tompkins found Daly still on the lounge in the kitchen. He testified that Daly kept his eyes closed all the time that he (Tompkins) was there that morning and that, concluding from appearances that Daly was unconscious at that time, he made no effort to talk to him about a will or the execution of one. Tompkins remained in the room for only a brief time, during which (he testified) Mrs. Wedemeyer gave him a glass of whisky, sweetened with honey, and also gave deceased what appeared to be the same kind of a beverage.

Shortly after Tompkins had left, Mr. Meyer and a Henry Meyerholtz arrived at the residence of Mrs. Wedemeyer. What occurred there, if anything of importance, during the stay of these gentlemen, except the fact that the deceased is purported to have made a will, to which said Meyer and Meyerholtz are subscribing witnesses, giving all his property to Mrs. Wedemeyer, is not made to appear by the record.

On the following day—Friday, the twenty-fifth day of December—Daly passed away. On the afternoon of the

succeeding day—the 26th of December—his remains were interred. On that same day, immediately following the conclusion of the ceremonies attending the interment, Mrs. Wedemeyer repaired to the office of Mr. Frank A. Meyer, the attorney who witnessed the will and evidently drew it, and there and at that time signed a document that she called "the administrator papers," but which was, in fact, a petition for the probate of the will of Daly.

Several letters addressed to the deceased in his lifetime by his sisters and other relatives in Ireland were introduced and received in evidence. These letters were couched in terms of endearment and affection, thus indicating that the most amicable and agreeable relations existed between the deceased and his family residing in his native country.

A number of witnesses testified that Daly had often expressed the intention of leaving his property, on his death, to his mother or other relatives. There is evidence that the deceased had very slight, if any, acquaintance with Mrs. Wedemeyer, one of the witnesses testifying that the deceased declared to her, a few weeks before his death, that he had no personal acquaintance with the respondent whatsoever. It appears that a Mr. Raymond, a neighbor of deceased, had informed Daly, prior to his removal to the home of Mrs. Wedemeyer, that the latter had expressed a willingness to take care of him. That Daly had grown and was, for some time prior to his removal to the home of Mrs. Wedemeyer, greatly enfeebled in body and mind, is an inference clearly supported by the evidence. Moreover, as seen, there is evidence justifying the inference that Daly, at the time of the purported execution of the will, was in a condition, both physically and mentally, in which he could have been induced, with little persuasion, to have done almost anything that he might have been requested to do, particularly by one who had been kind and attentive to him in the last few hours of his fatal illness. In other words, it is fairly deducible from the evidence that at the time he signed the alleged will he was incapable of exercising independent judgment in any ordinary business transaction. And, not the least significant, as tending at least to excite suspicion as to her good faith in the part she took in the transaction leading to the execution of the alleged will, is the testimony of Mrs. Wedemeyer her-

self. She declared that, although she signed the petition for the probate of the will, as executrix thereof, on the day of the funeral and immediately after the conclusion of that ceremony, she, nevertheless, was ignorant of the contents of the will and of the identity of the person or persons to whom the deceased had thus given his property until some time after the petition for probate had been filed, when, for the first time, she learned that she was the sole devisee through an item printed in one of the local newspapers published at Petaluma. It is hardly believable that a party who has been made the executrix of the last will of a deceased person would take the essential preliminary steps toward proving such will without an examination of the document to ascertain something of the duties, responsibilities and burdens imposed upon her by the terms' of the testament, and it appears to us that the natural effect of such testimony, considered in connection with the circumstance of the haste after the death of the alleged testator with which the document was started on its way to the probate court, would at least be to inspire great distrust in the honesty or good faith of the transaction by which the deceased was led to sign the purported will.

In short, it is very clear that the evidence produced by the contestant, and which appears in the record, fairly justifies the inference that Daly signed the alleged will, not as the result of his own volition, but solely through the influence which, by reason of his debilitated mentality, Mrs. Wedemeyer was able to exert upon him. There is certainly no ground for inferring from the evidence produced that Daly had any motive or reason for giving his property to a comparative stranger. There is, on the other hand, no apparent reason why he should have excluded his mother and brothers and sisters from his testamentary bounty. To the contrary, as seen, it would seem to be quite manifest, from the evidence, that up to the very time the deceased was taken to the home of Mrs. Wedemeyer, his wish was that his relatives should receive his property at his death, and that his intention then was to so provide in his last will.

Without going into further detail as to the inferences that may fairly and reasonably be drawn from the evidence against the validity of the alleged will, it may be said generally that the evidence is pregnant with circumstances from which a jury

would be justified in reaching the conclusion that the purported will was not, in truth, the will of the deceased, and that, while it is clear from the evidence that he intended that Mrs. Wedemeyer should be well compensated for her services in caring for him (deceased's statement to Tompkins that she should be given the stock and poultry on his ranch), it is equally clear that the revealed circumstances very strongly indicate that he intended that the residue of his estate should go to his relatives in Ireland.

Our conclusion is that the court should have allowed the case to have gone to the jury on its merits, and that its refusal to so submit it was clearly erroneous.

The judgment is, therefore, reversed and the cause remanded.

Chipman, P. J., and Burnett, J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on March 10, 1911, and the following opinion then rendered thereon:

HART, J.—Counsel for respondent herein, in their petition for a rehearing, among other things, say: ''Consciously or unconsciously, by the decision of this court, rendered in the above-entitled cause, the rules established by the supreme court seem to be reversed and set aside, and a new rule, not supported by any authority except this opinion, declared in place thereof.'' They then cite and quote from the following cases to demonstrate how far wide of the mark our former opinion went in the enunciation of the rules governing the determination of a motion for nonsuit on the close of the case for plaintiff: *In re McDevitt,* 95 Cal. 33, [30 Pac. 101]; *In re Langford,* 108 Cal. 613, [41 Pac. 701]; *In re Kaufman,* 117 Cal. 295, [59 Am. St. Rep. 179, 49 Pac. 192]; *Estate of Nelson,* 132 Cal. 189, [64 Pac. 294]. An examination of the foregoing cases will show that, either ''consciously or unconsciously,'' counsel have permitted themselves to be led into what appears to us to be an inexcusable misapprehension of the nature of the question presented by a motion for a nonsuit, for, obviously, the cases cited have no more application to the question decided in this case than the code of Hammurabi would have to the solution of the much mooted question

15 Cal. App.—22

whether Peary or Cook was the first to discover the long lost North Pole. In each of those cases the case had been tried on the merits, a jury having passed upon the facts, and the appeal was from the judgment entered upon the verdict or an order denying a new trial or from both, and of course, the facts could not be reviewed unless the evidence was of such a character as to present a question of law.

In the case at bar, the complaint of the appellant is based solely upon the ground (and the appeal here could present no other ground for its support) that the court committed an error of law in declaring that, as a matter of law, the facts produced by plaintiff were not of sufficient probative value in the proof of the issues tendered by the contest to justify the submission of the case to the jury. It is elementary, as we tried to show in the original opinion, that a motion for a nonsuit presents a question of law pure and simple. No question of conflict of evidence can arise on such motion, for the facts which appear to have been proved by the evidence must be assumed to be true by the court in deciding the motion, and if, as so viewing the evidence, there appear sufficient facts to make out a *prima facie* case in favor of contestant, the court has absolutely no right to take the case from the jury, even if there is an abundance of evidence tending to sustain the will or disprove the facts established in behalf of contestant. Indeed, the authorities all say that evidence in conflict with testimony favorable to the contestant must be disregarded. We may remark that if, upon the evidence presented by this record, the case had gone to the jury and a verdict had been returned favorable to the contestee, we are not prepared to say but that the evidence would be sufficient to support the verdict. And in that case only would the cases cited by counsel be in point. But, as stated, the sole question here is, Was the court justified in declaring, as a matter of law, assuming, as it was bound to do, that all the facts in favor of contestant were true, that a *prima facie* case was not made against the validity of the will? An examination of the record can justify no other answer than that given in the decision of the case.

We find it to be true, as counsel contend, that we were not precisely correct in saying in the former opinion that the deceased was often heard to say that he desired that his

sister in Ireland come to his home and take care of him. What he did say was that, should he send for his sister, she would come, but that he "would rather be alone." But the inaccuracy is immaterial, since the only purpose of referring to that evidence was to disclose that he was on affectionate terms with his near relatives living in Ireland. Other testimony given on this point tends to show the fact of the friendly relations between himself and said relatives equally as strongly as the inaccurate version of the testimony as given in our opinion. Indeed, there is an abundance of evidence in the record, independent of that which counsel say we inaccurately quoted, showing that the relations between deceased and his relatives were of the most friendly character at all times.

Counsel further say in their petition: "The statement by the court in the opinion, also, that he (Daly) was but slightly acquainted with Mrs. Wedemeyer, is also contrary to the testimony. *The only testimony relating to this question is that of Mrs. Sanders on page 107 of the transcript, and we submit that this does not sustain the court's conclusion, while Mrs. Wedemeyer's testimony proves that they had been acquainted for some time.*" (Italics ours.) The foregoing only furnishes another illustration of the many to be extracted from their petition of a "conscious" or "unconscious" failure on the part of counsel to distinguish between a review of a judgment on a nonsuit and a judgment on the merits. As we have shown to be elementary as a rule governing the determination of a motion for a nonsuit on the close of plaintiff's case, where there is some testimony in proof of a fact in favor of plaintiff or contestant, such testimony must be assumed by the court to tell the truth concerning such fact.

The testimony of Mrs. Sanders was that the deceased had said to her, shortly before he was taken to Mrs. Wedemeyer's, that he had very slight acquaintance with the latter, and it is very manifest, under the rules applicable to motions for a nonsuit made on the conclusion of a contestant's or plaintiff's case, Mrs. Sanders' testimony must be accepted on that point and that of Mrs. Wedemeyer contradictory thereto disregarded.

We may here state that we did not undertake nor pretend to recite all the evidence, or even give the substance of all the evidence, in the opinion originally filed. The record discloses

an abundance of circumstances, to which we did not specifically refer, from which the jury would have been justified in finding against the validity of the will. For instance, the witness Kelley, of whose testimony we made no specific mention in the opinion filed herein, said that he had known the deceased ever since he (deceased) located at Cotati; that the two men often exchanged visits and carried on conversations; that, said the witness, "I think he always was a man of rather weak mind, not strong. During the ten years I knew him he had the habit of going back and restating his conversations."

The fact that deceased was, when making the alleged will, surrounded by persons who were not his close personal acquaintances, is of no small significance in determining, from all the circumstances, whether he was acting on his own independent judgment at that particular time. In short, as the situation, as presented by the record, is well summed up by counsel for appellant, "in the case at bar are found the elements of weak mind, a will made upon a death-bed, surrounded by those having an influence or authority over him, want of independent advice," to which may be added the fact that he made the will at the home of the sole devisee.

We can see no possible ground upon which it may in justice or reason be held that the court did not err in its order granting the motion of the contestee for a nonsuit and thus precluding a determination of the issues upon the merits of the case.

Rehearing is denied.

Chipman, P. J., concurred.

Burnett, J., concurred in the judgment.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on April 7, 1911.