[Civ. Nos. 3132, 3133.   Third Appellate District.—January 29, 1927.]

## E. G. HENRY, Appellant, v. F. I. LINGSWEILER, Respondent.

[1] APPEAL—ORDER GRANTING NONSUIT.—An order granting a nonsuit is in legal effect a judgment of nonsuit, from which an appeal may be taken.

[2] ID.—NONSUIT—JUDGMENTS.—An appeal from a formal judgment of nonsuit, entered upon an order granting a nonsuit under section 581 of the Code of Civil Procedure, is unnecessary and superfluous, where an appeal is taken from the order granting the nonsuit.

———

1.   See 2 Cal. Jur. 158.

[3] TRIAL — MOTION FOR NONSUIT — NATURE OF — DEMURRERS — EVI-
DENCE.—A motion for nonsuit presents a question of law for the
court, and is tantamount to a demurrer to the evidence, or an
objection that the proved material facts, admitting them to be
true, do not in legal effect operate in favor of plaintiff.

[4] ID. — NONSUIT — EFFECT OF EVIDENCE. — The evidence, on motion
for nonsuit at the close of plaintiff's case must be accorded the
benefit of its full probative force and must be taken most
strongly against the defendant, regardless of whether or not it
was erroneously admitted.

[5] NEGLIGENCE—INJURY TO PEDESTRIAN—AUTOMOBILES—EVIDENCE —
NONSUIT.—In this action for damages for personal injuries sus-
tained by a pedestrian when struck by an automobile while cross-
ing a street near an intersection, where there was evidence that
the driver of defendant's car was driving at an excessive speed,
in violation of section 20 (a) of the Motor Vehicle Act of 1915,
without warning the pedestrian of the approach of the car, in
violation of section 12 of said act, the question of the driver's
negligence was one for the jury and the trial court erred in
granting defendant's motion for nonsuit.

[6] ID.—AGENCY—EVIDENCE.—In such action, evidence showing that
the car was driven by defendant's stepdaughter was sufficient, on
motion for nonsuit, to require the submission to the jury of the
question as to whether or not the stepdaughter, in driving the
car at the time of the accident, was acting as defendant's agent.

[7] ID. — EVIDENCE—AGENCY — INFERENCES — NEW TRIAL — NONSUIT.
In an action for damages for personal injuries sustained when
struck by defendant's automobile driven by a person other than
defendant, it is within the legal province and discretion of the
trial court, on motion for a new trial, to say whether defendant has
presented evidence sufficient to overcome the inference of agency
raised by plaintiff's proof of ownership of the automobile by one
party and the operation of the machine by another party with the
knowledge and consent of the owner, but on motion for nonsuit,
any proof received tending to overcome such inference is to be
disregarded.

[8] ID.—PEDESTRIAN STRUCK BY AUTOMOBILE NEAR STREET INTERSEC-
TION — CONTRIBUTORY NEGLIGENCE — EVIDENCE.—In an action for
damages for injuries sustained by a pedestrian when struck by an
automobile while crossing a street near an intersection, the ques-
tion of the pedestrian's contributory negligence is for the jury.

3.   See 9 Cal. Jur. 547; 3 R. C. L. 192.
4.   See 9 Cal. Jur. 551.
8.   See 19 Cal. Jur. 735.

[9] ID.—HIGHWAYS — TRAFFIC CONDITIONS — PEDESTRIANS — CARE.—A pedestrian crossing a boulevard is required to exercise that degree and amount of care which the usual traffic conditions of the thoroughfare require.

[10] ID.—APPROACH OF VEHICLE—PRESUMPTIONS.—A pedestrian crossing a street near an intersection has the right to assume· that no vehicle will approach him from the left beyond the medial line of the street.

[11] ID. — PLEADING — DEFECTIVE BRAKES—EVIDENCE.— The defective condition of the brakes of an automobile, in violation of section 14 of the Motor Vehicle Act of 1915, may be proved under a general allegation that the automobile "was being operated in a reckless, negligent and careless manner, and in violation of the laws of the State of California."

---

(1) 3 C. J., p. 497, n. 26.   (2) 3 C. J., p. 353, n. 51.   (3) 38 Cyc., p. 1551, n. 59, 61.   (4) 38 Cyc., p. 1551, n. 63, p. 1554, n. 91.   (5) 42 C. J., p. 1244, n. 18.   (6) 42 C. J., p. 1260, n. 12.   (7) 38 Cyc., p. 1554, n. 95.   (8) 42 C. J., p. 1268, n. 17.   (9) 42 C. J., p. 1147, n. 34.   (10) 42 C. J., p. 1137, n. 66.   (11) 42 C. J., p. 1199, n. 80.

APPEALS from a judgment of the Superior Court of Los Angeles County. Charles Monroe, Judge. Reversed.

The facts are stated in the opinion of the court.

Goudge, Robinson & Hughes and Ben S. Beery for Appellant.

Hubert T. Morrow and A. R. T. Truex for Respondent.

HART, J.—There are two appeals upon the same record, viz.: The one from an order granting a nonsuit and the other from a formal judgment of nonsuit. [1] The appeal from the original order granting the nonsuit was proper and sufficient to authorize a review of the action of the court in the making of said order. In fact, the "order" granting the nonsuit amounted in legal effect to a judgment of nonsuit, since it necessarily involved a final and definitive disposition of the case, and such a judgment is, therefore, one from which an appeal may be taken. [2] The appeal secondly taken, viz.: From the "formal judgment" of non-

---

9. See 3 Cal. Jur. 877; 2 R. C. L. 1186.

suit, which means a formal judgment subsequently prepared and entered upon the "order" granting the nonsuit, was wholly unnecessary and, indeed, superfluous. (Code Civ. Proc., sec. 581; *Brown* v. *Sterling Furniture Co.*, 175 Cal. 563 [166 Pac. 322].) However, we will dispose of both appeals as though both were material and requisite to the decision of the case as it appears before us.

The action was by plaintiff against the defendant for damages for personal injuries suffered by the former by reason of having been struck by the automobile of the latter through the alleged negligent driving of said automobile.

The accident in which plaintiff was injured occurred on one of the highways of the county of Los Angeles, on the seventeenth day of October, 1922, near the noon hour of that day. The complaint alleges that plaintiff was at the time walking over and across Santa Monica Boulevard, near its intersection with Formosa Avenue (about fifty feet from the west side of Formosa Avenue), in said county, and "was proceeding in a northerly direction, and was beyond the center of said Santa Monica boulevard, to-wit: On the second (street) car tracks"; that, as plaintiff was so proceeding an automobile owned by defendant was traveling over and along Santa Monica Boulevard in an easterly direction, said automobile being then "so unskillfully, carelessly, recklessly and negligently managed and operated that it was driven wantonly and wilfully into and against plaintiff" while the latter was, as above indicated, at a point on Santa Monica Boulevard; that, by reason of so being "run into and against" him, plaintiff was "violently thrown to the ground with great force and violence underneath its (said automobile's) wheels, which ran over his head and body, thereby causing the injuries hereinafter complained of." It is alleged that said automobile, while owned by defendant, was at the time of the accident "being driven by his agent and servant in charge and control thereof, who was then and there acting within the course and scope of her employment, to-wit: The driving and operating of said automobile in and about and for the benefit of the business of the defendant." Further it is alleged that, immediately prior to the time of its collision with plaintiff, said automobile was being operated and driven at a rate of about thirty miles per hour, "when the driver's view of the

road was obstructed," and that said car was not "slowed down" nor any attempt made to diminish the speed at which it was then being driven as it approached the plaintiff; that no signal or warning was at said time given plaintiff of its approach; that said car, at said time, was not "being operated as near the right-hand curb of Santa Monica boulevard, as possible, but, on the contrary, was being driven over and along the left-hand side of said boulevard." The complaint then describes with some particularity the nature of the several injuries thus inflicted upon the body of plaintiff, alleging further that the latter was by reason of said injuries confined for a long period of time in a hospital undergoing treatment therefor, and that he "has been informed and believes" that the injuries thereby sustained to his head, thighs and knees, will be permanent. The prayer is for damages in the sum of five thousand five hundred dollars.

The answer specifically denies the averments of the complaint, states facts negativing the claim that the driver of the machine was, at the time of the accident, operating and driving the car as the agent of defendant, and pleads the defense of contributory negligence on the part of plaintiff as the efficient or proximate cause of the personal injuries inflicted upon the last-named because of the mishap.

Plaintiff's case, so far as the proofs were concerned, being closed, the defendant moved for a nonsuit, the motion being based upon three grounds, to wit: 1. That, while the defendant's ownership of the car was admitted, the evidence as produced by plaintiff failed to show that the party driving or operating the machine at the time the accident happened, was, as such driver or operator, the agent of defendant, but that she was then thus using the car for her own purposes; 2. That the evidence wholly failed to show that the injuries received by plaintiff were directly or proximately caused by the negligence of said driver; 3. That, to the contrary, the evidence disclosed that the injuries complained of were proximately caused by plaintiff's own negligence—that is to say, that the accident and resulting damage to plaintiff's person was directly due to contributory negligence on his part.

The court below, in disposing of the motion, based its order on the grounds that the evidence failed to show that

the driver of the car was, at the time of driving it and at the time the accident occurred, acting as the agent of defendant, and that the evidence showed that the plaintiff's own negligence proximately contributed to or caused the damage. As to the alleged negligence of the driver of the car, the court in effect stated that, upon that question, the testimony was such as to make the case one for the jury and that but for the other grounds of the motion and upon which the order granting the same was founded, it would probably feel compelled to deny the motion.

Santa Monica Boulevard, on which the accident occurred, is a street in the county of Los Angeles running east and west. In the center thereof is a double street-car track, one for the east-bound cars and one for the west-bound cars. Said boulevard is approximately sixty feet in width between the curbs and the distance from the south curb to the south rail of the east-bound car track is approximately twenty-one feet, three inches. The distance between the rails of both the east-bound and west-bound car tracks is four feet, nine inches. The distance between the east-bound and west-bound car tracks is approximately eight and a half feet, and the distance from the north rail of the west-bound car track to the north curb is approximately twenty-one feet, three inches.

The driver of the car that struck plaintiff was a Miss Ethel Buser, the stepdaughter of the defendant. It was admitted that the latter was the owner of the car.

It appears that the plaintiff, on the seventeenth day of October, 1922, was in the employ of a concern known as the "King Vidor Studio," at 7250 Santa Monica Boulevard, in the county of Los Angeles; that at or near the noon hour of that day one W. L. Harmon, also employed by said concern, and one L. E. Roberts, were about to start in the latter's automobile to lunch; that plaintiff, also desiring to go to lunch, asked Roberts and Harmon and was given by them permission to ride with them to a restaurant known as "Nick's Cafe," located on Santa Monica Boulevard, about eighty feet east of Formosa Street; that plaintiff took a seat in the rear of the automobile, and that, on leaving the studio grounds, Roberts, who was driving, turned east on Santa Monica Boulevard and continued so to travel until he reached the point on said boulevard at which the cafe named

was located, when the plaintiff stated, referring to the cafe, "This is the place where I eat." He testified: "I then got on the running-board, and of course after getting out, I looked back (to the west) to see if there were any cars approaching which were near enough to be dangerous. I noticed that there were not. I stepped off the running-board and threw up my hands and said that I was all right. At the time I got off the running-board, the car in which we were driving was almost at a standstill, and was directly north and opposite a car parked on the south side of Santa Monica boulevard, opposite Nick's Cafe. Our car could not get to the curb at that point because this car was parked next to the curb. After getting off the running-board, I started walking across the street to the restaurant and walked to and passed the center of the street, *that is, past the center of the space between the east-bound and west-bound car tracks.* After crossing the center of that space, I partially turned, considering that I was safe from automobiles coming from the west, and watched the other automobiles coming from the east and going west. How far I went after that I could not tell, as all I was conscious of was a shock and a fright, and I did not know anything more until I became conscious in the hospital eight and one-half hours later." On cross-examination, plaintiff stated that the reason he threw his hands "up in the air" as he alighted from the running-board of Roberts' machine was because "they (Roberts and Harmon) would take notice and understand that he was all right and clear of the (their) machine." He also stated, on cross-examination, that when he alighted, he was not looking in the direction the Roberts machine was going (toward the east), but was "looking back" or "toward the west." Asked by defendant's counsel whether, as he threw his hands up on leaving the Roberts automobile, either Roberts or Harmon cautioned him to "watch out, or look out," plaintiff testified that he was under the impression that one of the parties named had thus warned him, but that the warning was given before he alighted from the car; that "before I got off (the Roberts car), I looked back west and kept my eyes turned that way, judging the distance of the cars in back, so that I would be in no immediate danger. I walked into the street, and when

I got across the center, I partially turned to look toward the east for the cars going that way."

W. L. Harmon, above mentioned as one of the parties in the Roberts car as it was taking plaintiff to the cafe, testified: "As we approached and were approximately thirty feet from the cafe, which is known as Nick's Cafe, we were going about twelve or fifteen miles an hour. Mr. Henry said, 'Here is where I get out,' or 'Here is where I eat,' or something to that effect, and in doing so he alighted. Mr. Henry got out on the running-board of the car, and I told him to be careful. As we passed a car parked by the south curb of Santa Monica Boulevard, opposite the cafe, and had practically stopped. Mr. Henry alighted, facing the restaurant. Mr. Henry gave a wave of his hand practically at the same time as he left the machine and stepped on the ground. He started walking across the street at a medium speed, and had gotten practically to the center of the street when an automobile passed between Mr. Henry and us, and soon thereafter an Oldsmobile coupe came along riding the center of the car tracks, going east. By that time Mr. Henry was on the north side of the street, north of the center a step or two. The Oldsmobile coupe struck Mr. Henry with the right front fender and right front wheel, both wheels passing over his body. I immediately got out of our car and went into the cafe to get a towel. . . . Mr. Henry was lying on the north side of the center of Santa Monica boulevard."

On cross-examination, Harmon testified: "I actually saw the car strike Mr. Henry, and at the time the car struck Mr. Henry, he was walking toward the restaurant. He was not standing still. I saw Mr. Henry from the time he left the machine until the machine which passed between him and us, which was going I should estimate around 20 miles an hour, obscured my vision. I did not see the Oldsmobile coupe before Mr. Henry had alighted from our machine, but did see it after he had alighted and just before he was struck. I saw the Oldsmobile coupe when Miss Buser, the driver, turned out of her path on the right-hand side of the street and into the center of the street to pass the other car which went between Mr. Henry and ourselves. Mr. Henry had plenty of time to pass in front of the car which later went between him and ourselves and to walk to

the north of the center of the road before he was struck. Mr. Henry was walking at a medium speed, and was neither walking fast nor slow. After this car passed between Mr. Henry and ourselves, I saw the Oldsmobile coupe for the first time, and it was then running in the west-bound car track in position to hit Mr. Henry. Its left wheels were in the center of the west-bound car track. The car turned suddenly to the right, just before it struck Mr. Henry, turning right into him. After Mr. Henry left the car, he was looking to the left, that is, to the west, sufficient for protection to himself. I cannot say which way he was looking at the exact time he was struck.''

Mrs. Helen Schuyler, sister of Miss Ethel Buser, who was at the time of the collision operating the car that struck plaintiff, was in said car with her sister when the accident happened. Mrs. Schuyler testified: ''On or about the 17th day of October, 1922, about noon, I was driving in the Oldsmobile coupe with my sister. The Oldsmobile coupe was owned by my father, and was being driven from my father's home on Ogden drive toward the city. My sister Ethel Buser was driving the car. I first saw Mr. Henry about two minutes before the car struck him. We turned around one car to get past, and were rather in a hurry, and we were right on him before we realized it. I have driven a car for many years and would judge that we were driving between twenty-five and twenty-eight miles an hour. When Mr. Henry was struck, he was about in the middle of the street between the two car tracks. No warning was given, and I could not say whether or not the brakes were applied before Mr. Henry was struck. We had turned out to pass a car, and that brought us to the center of the street. We were just passing the car when the accident happened. We struck Mr. Henry while he was between the car tracks, and, as I remember it, we had turned to the extreme left-hand side of the track, and then turned in to the right. I first saw Mr. Henry when he was getting off the running-board. I saw him all the time after he got off the running-board, perhaps 15 feet away from me at that time, until he was struck. There was a car parked at the curb, and north of that was the car that Mr. Henry got off, and north of that was the car which came between us and the car which Mr. Henry got off, and we drove around all three cars and ran

over Mr. Henry.   No signal was given before we went to pass the car which was driving ahead of us.   Q. By Mr. Hughes: Where were you going, or bound for, at the time of this injury?   A. We had some shopping to do, and were going down to pay the telephone bill.   The Court: The telephone bill?   A. The bill my father had given my sister to pay— my mother had given it to her to pay it.   Mr. Morrow: We move to strike out the testimony unless it is known that it is in the knowledge of the witness.   The Court: Did you see your mother give her the bill?   A. Yes, I did.   The Court: Motion denied.   Q. By Mr. Hughes: Now, were you going any other place—bound any other place, rather? A. We were going to do some shopping for my mother, and also going down town to see an attorney on some business.''

On cross-examination Mrs. Schulyer testified: ''At a point one hundred or one hundred fifty feet from the scene of the accident, my sister was driving on the right-hand side of Santa Monica boulevard between the east-bound tracks.   I mean by that that the left wheels of our car were between the rails of the east-bound car track.   Her right wheels would be some distance over to the right of the south rail. The car that we passed at the time the injury occurred had passed us previous to the accident, going at a speed of about thirty miles per hour.   I don't know how far from the scene of the injury the car which we were passing when the injury occurred, first passed us.   I saw Mr. Henry jump off the automobile but did not see him throw either arm up.   Mr. Henry was walking at a medium speed.   I do not remember whether or not he looked in our direction.   I did not call my sister's attention to the fact that this man was jumping off that car.   Mr. Henry passed in front of the machine ahead of us, but I do not know how far in front of it.   I think he went in front of the machine and just had time to get by.   Then we hit him, soon after he got by.   When he started to walk in front of that other machine our machine had started to pass up that machine.   He stepped right out from in front of that machine right in the pathway of our machine.   I judge he was the length of our machine in front of us when he stepped in front of our machine—or about ten feet.   When we passed the other car, I should judge it was going at *about thirty miles an hour, and we turned around to our left.*   We were going to speed up, as

we were in a hurry, and we went around this car to go
past it, and the first thing I knew, Mr. Henry was right un-
der the car. As we started to pull over to the left to go
around them, I said I was in a hurry and my sister put on
a little more speed. . . . I should judge the car which we
passed was not quite in the middle of the track, and when we
went around that car, we went way over on the other track,
that is, on the west-bound track, to the north of the center of
Santa Monica boulevard. We went around rather quickly to
pass the other car and Mr. Henry was right about the middle
of the track, and perhaps over a bit, and we ran over him.''

Miss Ethel Buser, driver of the car, testified that the
automobile was owned by her stepfather; that some time
prior to the date of the accident her father, intending to
depart for some other place, gave her possession of the car
and the key thereto; that her father was not in Los Angeles
County on the day of the accident. She stated that she was
the only member of the family that drove the automobile
and that when her father delivered to her the possession of
the car he said to her that during his absence she should
drive her mother about and do any other service in con-
nection with the household affairs; that they were having ''a
lot of trouble with the telephone and my mother told me
to go in that day (the day of the accident) and report to
Mr. Battery of the Telephone Company that our phone had
been out of service for a number of days. And she (re-
ferring to her mother) gave the bill to pay and told me
to pay the telephone bill, and also a sample of material for
a blue dress she was making and I was to get that that day.''
The telephone bill, she stated, was her father's bill and the
telephone was at their home 1409 Ogden Drive. ''Q. Well,
then, where were you bound at the time of the accident?
A. Down to the telephone company. That was my first mis-
sion. Q. What other missions were you bound upon, if
any? A. I had a sample of blue material. My mother
was making a gown and I was to take the material back to
her. Q. Before your father went away, had that car been
used? A. By whom? Q. I am asking the question. Had
it been in use? A. My father always drove it. Q. For
what purpose was the car in use before your father went
away? A. He always drove it for his own pleasure and for
his business. I had never driven the car in my life for my

own pleasure. Q. State whether or not you ever drove the car before your father went away. A. Yes. I had down to Gardner Junction to do the marketing. Q. From whom did you receive directions to drive the car? A. My father.''

The above statement comprehends the salient facts brought out by the testimony presented by the plaintiff in support of his complaint. The sole question submitted for decision is, of course, whether the court below was legally authorized upon that testimony to take the case from the jury.

[3] The rules governing the decision of a motion for a nonsuit are well settled and equally well understood. They may, however, with propriety briefly be re-stated here. ''A motion for a nonsuit,'' says the court in *Bush* v. *Wood*, 8 Cal. App. 650 [97 Pac. 710], ''presents a question of law for determination by the court. The motion is tantamount to a demurrer to the evidence, or an objection that, admitting all the proved material facts to be true, said facts do not in legal effect operate in favor of plaintiff, or, in other words, do not entitle him to the relief asked for by him.'' [4] And the evidence, on a motion for a nonsuit on the close of plaintiff's case, must be accorded the benefit of its full probative force, and this is true whether the evidence has been erroneously admitted or not. (*In re Daly*, 15 Cal. App. 325, 331 [114 Pac. 787].) The evidence, on such a motion, must be taken most strongly against the defendant. (*Goldstone* v. *Merchants' Ice Co.*, 123 Cal. 625 [56 Pac. 776].)

''Every favorable inference fairly deducible, and every favorable presumption fairly arising, from the evidence produced must be considered as facts proved in favor of the contestants. Where evidence is fairly susceptible of two constructions, or if either of several inferences may reasonably be made, the court must take the view most favorable to the contestants. All the evidence in favor of the contestants must be taken as true, and if contradictory evidence has been given, it must be disregarded. If there is any substantial evidence tending to prove in favor of contestants all the facts necessary to make out their case, they are entitled to have the case go to the jury for a verdict on the merits.'' (*Estate of Arnold*, 147 Cal. 583 [84 Pac. 252]; see, also, *Estate of Welch*, 6 Cal. App. 45 [91 Pac. 336].)

[5] Tested by the foregoing principles, it is clear, from an examination of the testimony herein, that the judgment

of nonsuit from which this appeal is prosecuted cannot be upheld.

There can be no question that there is evidence which shows that at the time she drove her car into and against the plaintiff, thereby inflicting the injuries upon the latter of which he here complains, Miss Buser was, in driving the car, guilty of gross carelessness. The testimony of her companion riding with her at the time (her own sister) clearly —indeed, unquestionably—supports this statement. She testified, as seen, that she said to her sister (the driver of the car) that she was in a hurry "and my sister put on a little more speed"; that thereupon Miss Buser speeded up the car so that it was then being driven approximately at the rate of thirty miles an hour; that, while the car was being driven at that rate of speed, it was turned to the left or toward the north side of the boulevard, to "go past another car," and that it was then that their car struck the plaintiff. She further testified, as will be noted, that her sister gave no warning signal of the approach of her car. Thus driving her car, and without sounding any warning, or giving any signal of its approach, on a much-used thoroughfare by both motor vehicles and pedestrians, as the evidence indicates was the traffic situation of Santa Monica Boulevard in the block in which the accident occurred, constituted on the part of the driver not only intrinsic negligence, but negligence *per se*, or as a matter of law, since the act of commission and the act of omission mentioned were in violation of the express mandates of the statute. (See section 20a of the Motor Vehicle Act 1915 (Stats. 1915, p. 406), regulating the rate of speed over highways and the degree of care required in the operation of motor vehicles with respect to the right of pedestrians, and section 12 of same act, requiring motor vehicles to be equipped with sufficient warning apparatus, the same to be used for the purpose of giving warning to pedestrians, etc., of the approach of such vehicles.) But the trial court itself, having, as shown above, intimated that there was evidence showing or tending to show that the driver of the car was guilty of negligence in its operation at the time the plaintiff was struck, further consideration of that phase of the case may be dispensed with. [6] This leaves for consideration the principal grounds upon which the court seems to have predicated the order or judgment of

nonsuit. The first of these involves the question whether there is evidence showing or sufficiently tending to show that, when the accident occurred, Miss Buser, in the operation of the car, was acting as the agent of and for the defendant. That there was some evidence to that effect there can be no manner of doubt, as must be manifest from the testimony, hereinabove reproduced, of Miss Buser herself. She stated, as will be observed, that she was the only member of the family that could drive an automobile, and that her stepfather (defendant) told her when he left for other parts to drive her mother about and do anything for the household that might be necessary, or words to that effect. She further testified, as will be noted, that when the accident occurred, she was on the way to the telephone office to attend to some business for the defendant in connection with the telephone at his (defendant's) home, the phone being out of order, and also to pay his telephone bill. She said that, while she had some other matters to attend to, her "first mission" was to attend to the telephone business for the defendant. There was, it is true, some conflict in the testimony regarding the business that she was first to attend to, Mrs. Schuyler having testified that she was first to take her to her (Mrs. Schuyler's) attorney's office; but, as has been above pointed out, the evidence on a motion for a nonsuit must be construed most strongly in plaintiff's favor, and so construing the testimony upon the question of agency, it is clear that there was sufficient proof to preclude any right in the court to grant a nonsuit against plaintiff upon the ground that there was not evidence supporting that element of the case as it is presented here. In other words, the testimony of Miss Buser to the effect that her first mission was to attend to the matter of paying her stepfather's telephone bill was sufficient to raise the inference that when operating the machine at the time of the accident she was acting as the agent of her stepfather. This "inference would be sufficient *prima facie* support to the verdict herein in the absence of substantial proof sufficient to destroy such inference." (*Ransford* v. *Ainsworth,* 196 Cal. 279, 281 [237 Pac. 747, 748], and the cases cited therein.) In *Fahey* v. *Madden,* 56 Cal. App. 593 [206 Pac. 128], the question of agency in cases of this character was considered by Presiding Justice Finch. Therein it was said: "It is conceded

that such agency may be inferred from proof of Madden's ownership of the car and Boen's operation thereof with the knowledge and consent of the former." In that case the appeal was from an order granting defendant Madden's motion for a new trial, the action being for personal injuries alleged to have been caused by the negligence of defendant, Madden being the owner of the machine and the defendant Boen the operator of it at the time of the infliction of the injuries complained of. A different situation would, of course, be presented on such an appeal from that presented here. [7] On a motion for a new trial, it is within the legal province and discretion of the trial court to say whether the defendant has presented evidence sufficient to overcome the inference of agency raised by plaintiff's proof of the ownership of the automobile by one party and the operation of the machine by another party with the knowledge and consent of the owner; but on a motion for a non-suit, any proof received tending to overcome such inference is to be disregarded. The case of *Spence* v. *Fisher*, 184 Cal. 209, 212 [14 A. L. R. 1083, 193 Pac. 255], contains an interesting discussion of the question as to the circumstances which would impute to the owner of an automobile liability for the negligence of another driving such automobile for the owner upon the theory that the driver was, when the injury occurred, acting as the agent for the owner. That case may be read with profit.

[8] The conclusion of the trial court that the plaintiff, at the time he received his injuries, was guilty of contributory negligence, or, in other words, that his injuries were proximately caused by his own negligence, is entirely without support. It has often been said that, "It is very rare that a set of circumstances is presented which enables the court to say, as a matter of law, that negligence has been shown." (*Seller* v. *Market-Street Ry. Co.*, 139 Cal. 268, 271 [72 Pac. 1006]; *Zibbell* v. *Southern Pac. Co.*, 160 Cal. 237, 241 [116 Pac. 513]; *Reaugh* v. *Cudahy Packing Co.*, 189 Cal. 335, 343 [208 Pac. 125]; *Rosenbloom* v. *Southern Pac. Co.*, 59 Cal. App. 102, 111 [210 Pac. 53]; *Wing* v. *Western Pacific R. R. Co.*, 41 Cal. App. 251, 257 [182 Pac. 969]; *Carey* v. *Pacific Gas & Elec. Co.*, 75 Cal. App. 129 [242 Pac. 97, 99].) As will be noted, from an examination of the testimony of the plaintiff and others, as hereinabove given, the plaintiff, hav-

ing, as he was crossing the boulevard looked toward the west and saw that it was safe for him to proceed so far as vehicles traveling from that direction were concerned, proceeded until after he had crossed the center of the street or the space between the east-bound and the west-bound car tracks and thereupon turned his face to the east to see if any car was approaching from that direction; that he saw automobiles proceeding westward from the east and regulated his movement so as to escape contact with them; that he had proceeded from the point between the east and west-bound car tracks but a short distance when he was struck by defendant's machine. [9] Of course, it was the duty of plaintiff to exercise that degree and amount of care in crossing or attempting to cross the boulevard which the usual traffic conditions of that thoroughfare required. And this, there is testimony to show, was what he did. [10] As was said in *Towne* v. *Godeau,* 70 Cal. App. 148, 153 [232 Pac. 1010, 1011], so it is true in the instant case: "Having satisfied himself of the absence of danger from that direction (from the west in this case), it was natural for him (plaintiff) to look to the right for east-bound (west-bound here) vehicles. He had the right to assume that no vehicle would approach him from the left beyond the medial line of the intersecting street." Considering all the testimony, we are satisfied that the question whether the plaintiff was guilty of negligence contributing proximately to his injuries was not one of law to be determined by the court, but one which it was the duty of the court to leave to decision by the jury.

[11] The plaintiff objects to a ruling of the court denying him the right to prove, as an element of the negligence of the driver of the automobile which did the damage complained of, that the brakes of said automobile were not in good condition. The witness Harmon, it appears, after the plaintiff was struck down, used the car driven by Miss Buser and which struck plaintiff, in which to take him (plaintiff) to a hospital. Harmon drove the car to the hospital. He stated that he had occasion to use the brakes of the car at that time and he found them in "very poor condition," explaining that "on one occasion in turning out from Santa Monica to the north on Gower Street to go to the Hollywood Community Hospital" he "practically went over the curb with the front right wheel turning to the left up on

the curb.'' On motion of counsel for the defendant that testimony was stricken out on the ground it was not within the issues as made by the complaint. The ruling was erroneous. As seen, paragraph V of the complaint alleges that the car that struck plaintiff was, at the time, ''being operated in a reckless, negligent and careless manner, and in violation of the laws of the State of California.'' Section 14 of the Motor Vehicle Act provides that ''all motor vehicles must be provided at all times with adequate brakes kept in good working order.'' The allegation referred to obviously responds to that provision of the act. It has uniformly been held in this state that in cases of this character proof is admissible under a general allegation of negligence that the operator of the automobile at the time the injury was committed was operating the machine in violation of the statute regulating automotive traffic over the roads and highways of the state. In other words, the cases hold where the negligence is charged in general terms it is sufficient, although the complaint does not state the particular acts constituting the negligence imputed to the defendant in the operation of the automobile. ''No principle seems to be better settled in this state than that 'negligence may be charged in general terms; that is, what was done being stated, it is sufficient to say it was negligently done, without stating the particular omission which rendered the act negligent.' '' (*Wiley* v. *Cole,* 52 Cal. App. 617 [199 Pac. 550]; *Smith* v. *Buttner,* 90 Cal. 99 [27 Pac. 29]; *Stein* v. *United Railroads,* 159 Cal. 368 [113 Pac. 663]; *Bergen* v. *Tulare County Power Co.,* 173 Cal. 709 [161 Pac. 269]; see, also, *Scragg* v. *Sallee,* 24 Cal. App. 133 [140 Pac. 706].)

The judgment appealed from in Civil No. 3132 and the judgment appealed from in Civil No. 3133 are and each of them is hereby reversed.

Finch, P. J., and Plummer, J., concurred.